(Court of Appeal, Parish of Orleans.)

MANSON BROS. vs. THOMAS AND JAMES HARRISON.

Appeal from Civil District Court, Divison "B."

Cage, Baldwin and Crabites, for Plaintiff and Appellee.

James McConnell, Jr., for Defendant and Appellant.

1. The consignees of a cargo of salt, ex-steamship from Liverpool, obtained a bill of lading therefor containing the stipulation, that this cargo of salt was "to be discharged at a wharf appointed by consignees, provided there is a berth vacant, immediately, she is ready to discharge the above, and that she can get there safely and be always afloat."

Prior to the ship's arrival, the consignees of the salt were advised by the ship's agent that the vessel would, upon reaching the port of her destination, berth at her own wharf to discharge other freight and would then proceed on a certain day thereafter, and there designated, to the wharf appointed by the consignees of the salt there to discharge that cargo.

On reaching her destination, the ship went directly to her own wharf and there proceeded to discharge her other cargo. In the process thereof, she there unloaded a portion of the salt against the protest of the consignees thereof. Subsequently, and on the day designated, the ship proceeded to the wharf appointed by the consignees of the salt, and being there berthed, discharged the balance of that cargo. Under an agreement that if it should be "without prejudice," the consignees accepted delivery at the ship's wharf of so much of the salt which had been discharged there and had it drayed to the place where delivery should have been made. The suit was to recover the cost of that drayage.

HELD: The ship is liable therefor.

MOORE, J. The British Steamship "Collegian," of which the

defendants are owners, cleared the port of Liverpool on 25th of November, 1891, bound for the port of New Orleans, and ladened with gunny bags and salt. The latter, consisting of 5525 sacks and five hundred tons in bulk, were consigned to the plaintiffs, who are salt importers in the latter city.

The bill of lading issued to plaintiffs contain the special stipulation that the salt is:

"To be discharged at a wharf appointed by consignees provided there is a berth vacant, immediately she is ready to discharge the salt and that she can get there safely and be always afloat."

The ship arrived at New Orleans early Sunday morning, the 15th of December, 1891, and went directly to her own wharf, which is known as the "Picayune Wharf," and is situated in the lower portion of the city; and on the following morning (Monday, December 16th), began discharging the cargo of gunny bags and so continued the next day (Tuesday, the 17th day of December) at about 9:30 o'clock A. M.

During the process of unloading the gunny bags on Monday, the ship's stevadore found it necessary, in order to get at the "gunnies," that some of the salt should be taken from the ship's hatches and this was done to the extent of 3867 sacks of salt being unloaded and deposited on the "Picayune Wharf." Learning of the unloading of their salt at the "Picayune Wharf" and desiring that the salt should be discharged at their warehouse wharf, situated at the upper portion of the city and immediately fronting their warehouse in which they intended storing the salt, plaintiffs at once protested against the discharge of the salt elsewhere. Upon receipt of this protest, which was in writing and which was delivered to the Ship's Agent about noon of Monday, December 16th, no more salt was discharged at the "Picayune Wharf; the ship, however, continuing to discharge her "gunnies" until Tuesday morning, the 17th of December, when at about 10 o'clock she steamed up river, berthed at the wharf indicated by the plaintiffs immediately in front of their warehouse and known as the "Tran-

sit Warehouse Wharf" and there promptly discharged the salt. To remove the 3867 sacks of salt from the "Picayune Wharf" to their warehouse fronting the wharf where the salt was intended to be stored, the plaintiffs were put to an expense of $283.50 for drayage,—and it is this sum which they seek by this suit to recover of the defendants.

The tesitmony of the Ship's Agent is to the effect, substantially, that on the Saturday preceding the arrival of the ship at this port, and after announcement that she had crossed the bar at the mouth of the river, the plaintiffs then "appointed" the Transit warehouse wharf as the place for berthing the ship and discharging the salt; that immediately upon the ship's arrival at New Orleans she was ready to discharge plaintiff's consignment at the wharf so appointed, but that the Transit wharf was blocked with other ships, and hence there was no vacant berth, thus rendering it impossible for the Collegian to discharge at that point; that the ship was consequently berthed at her own wharf and there proceeded to dischage her cargo; that although the ship, under these circumstances, had the right to discharge the entire consignment of salt at the Picayune wharf, nevertheless, considering the long years of pleasant business relations that had existed between plaintiffs and the ship agent, the latter waived his right to unload the entire cargo of salt at the Picayune wharf, and concluded merely as a favor to plaintiffs, to unload so much of the cargo which had not already been discharged at the Picayune wharf and then to unload the balance at the Transit wharf, when it was made ready to berth the ship on Tuesday morning.

On the other hand, the senior member of the plaintiff's firm, who seems to have been the one in charge of this particular matter, testifies, substantially, that on the Saturday preceding the ship's arrival he was advised by some one connected with the ship agent's office that the Collegian had crossed the bar; that she would not go direct to plaintiff's warehouse; that it was the intention to stop her

at the Picayune wharf and there discharge her cargo of "gunnies," which she had aboard, and then go up to the warehouse of plaintiffs and discharge the salt on Monday; that on Monday he was informed from the agent's office by telephone that the ship was detained and that she would not be able to get up to the Transit wharf before Tuesday morning; that at no time prior to Tuesday morning was any indication ever made that the ship was then ready to discharge the salt, (the prior indication that the ship would go up to their warehouse on Monday having been recalled); that immediately he was advised that the ship would go up to the Transit Warehouse on Tuesday, a berth thereat was prepared for her and that she did come up, was safely berthed and then discharged her cargo. , It is manifest that if prior to the arrival of the Collegian at the port of New Orleans the plaintiffs had advised the ship's agent of their "appointment" of the Transit Wharf as the place of landing; and . if immediately on the ship's arrival, she was ready to discharge her cargo at the wharf thus appointed; and if the plaintiffs were so advised; and if the wharf thus appointed was unprepared to berth her at that moment, or, at least, early on the following morning, (Monday), the ship was free to berth at her own, and usual wharf, and there to discharge and make delivery of the salt.

On the other hand, if the ship's agent notified the plaintiffs prior to the ship's arrival that she would go at once to her own wharf and there discharge a portion of her cargo other than that consigned to plaintiffs, and would then go up on Monday to the wharf appointed by plaintiffs, and then recalled that advice and subsequently notified plaintiffs that the ship would not be ready to go up to the Transit wharf until Tuesday morning and would then be ready to discharge the salt; and, if the Transit wharf was ready on the ship's arrival there on Tuesday to properly and safely berth her, then no delivery elsewhere than at the Transit wharf will bind the plaintiffs, and they may hence recover such amount as they may

have necessarily expended in removing so much of their consignment of salt, as was discharged elsewhere, to their warehouse. Upon the verity, therefore, of the respective statements, as above recited, of the several parties to this suit, the decision of this case must turn.

Both the ship's agent and the plaintiffs, all of whom testified in the cause, are admitted to be men of high character and unimpeachable integrity. Not the slightest suggestion was made that they were not only of equal character and reputation for truth and varacity, but it was admitted that all of them possessed this reputation and character in a high degree.

They were testifying, however, to transactions which occurred nearly three years prior to the date at which their testimony was given, hence, the marked conflict in their recollections of the salient facts of the case may be readily accounted as the result of faulty memory on the part of one or the other.

Under this circumstance, if the plaintiffs' recollection of the facts are not corroborated by evidence against which may not be opposed, this suggestion of faulty memory, then they cannot recover, for the *onus* is upon them to prove their case by a preponderance of evidence. It is not enough for them to make it probable; they must establish it with legal certainty.

This, in our opinion, they have done, as we find in the record several writings, which passed between the parties to this suit, contemporaneous with the happening of the event which gave rise to this controversy, and which fully sustain and corroborate the plaintiff's testimony as to the fact that the Collegian was not ready to discharge the salt at the Transit warehouse until *Tuesday*, and that plaintiffs were so advised by the agent of the ship *prior* to and *after* the ship's arrival.

On the 16th of December, (Monday), 1901, the plaintiffs wrote to the agent of the ship as follows:

"We understand the S.S. Collegian is discharging some of the

99

cargo of salt, consigned to us, at your wharf opposite Jackson Square, although you were notified that we wanted said salt discharged at our warehouse wharf, Levee between Fourth and Washington streets, so that same could be put in said warehouse. *You notified us that the above steamer would be ready to go to our wharf Tuesday morning,* and we do not see by what right she discharged this salt in violation of her bill of lading, and our position is such that we cannot accept delivery at your wharf.

Yours. truly,

(Signed) MANSON BROS.

. All are agreed that this letter was received by the ship's agent at about noon of the day that it was dated and that the ship's agent instantly gave orders to his ship's stevedore not to put out any more salt at the Picayune wharf, and none further was put out after this.

No other reply was made to this letter by the agent of the ship and no denial was ever made then or afterwards, so far as the record shows, that the statement in the letter that the agent had notified plaintiffs that the steamer would be ready to go to their wharf only on Tuesday, except the denial of that ·fact which was made nearly three years afterwards when the agent was testifying in the cause.

On the following day, Tuesday, plaintiffs again wrote defendant's agent demanding delivery at defendant's cost, and "as soon as possible," all the salt unloaded at the Picayune wharf.

This letter was replied to by the ship's agent and was received by the plaintiffs about 9 o'clock on the morning of Tuesday, (December 17). Acknowledging receipt of that letter he adds: "In reply, I beg to say that the wharf at your warehouse was not ready, and Capt. Cope so notified us and we therefore proceeded under the bill of lading to unload a portion of the salt at the Picayune tier, and I now tender you delivery there. We have

100

waited all the morning with the Collegian to go to your wharf and it is not ready for us." Not a word is said in this letter in denial of the statement contained in the letter of the day previous that the agent had notified plaintiffs that the ship would be ready on Tuesday morning to go up to and unload at plaintiff's wharf. Within two hours after the receipt of the agent's letter of Tuesday the "Collegian" had berthed and was discharging her cargo at the wharf appointed by plaintiffs.

On the following day, (Wednesday, December 18th, 1901), the plaintiffs again wrote to the ship's agent and answering his letter to them of the 17th, say:

"We cannot understand how you can take the position that delivery to us of any of the salt consigned to us on your S.S. Collegian can be made under our bill of lading or the facts of the case, at the Picayune tier.

*We were informed by you on the evening of Saturday, December 14th, that your steamship Collegian would not be ready to proceed to our wharf for the purpose of discharging our salt, until Tuesday morning, December 17th, no hour on Tuesday being fixed by you.*

On Monday, December 16th, without any notice to us, you unloaded at the Picayune tier certain of the salt consigned to us. When we protested against this, we were informed by one of your employees that it was necessary for the ship to unload the salt referred to in order that other cargo might be discharged.

On Tuesday, December 17th, 9:15 o'clock, A. M., we received by phone from you an inquiry as to whether our wharf was ready to receive the steamship Collegian, and we then informed you that the wharf would be ready by eleven o'clock A. M. At a quarter to eleven, the wharf was ready and we so notified you and shortly thereafter your steamship Collegian left the Picayune tier and proceeded to our wharf. Under these circumstances, and in view of our contract it is perfectly clear to us that delivery at Picayune tier is not proper delivery, and that the extra cost of having the

salt unloaded at the Picayune tier, transporting from that place to our warehouse should be borne by the steamship Collegian."

Then follows a proposition, in order to prevent an increase of damages, that the plaintiffs will accept the salt discharged at the Picayune wharf without prejudice to their right to claim of the defendants the cost of the cartage from that wharf to their warehouse.

No answer having been made to this letter, the plaintiffs on the next day, (Thursday, December 19), wrote again "insisting on an immediate answer." This letter was replied to by the ship's agent on the same day accepting and consenting to the acceptance of delivery by plaintiffs of the salt discharged at the Picayune wharf without prejudice or "waiver of any rights which you (plaintiffs) may think you have, (but which.I, the ship's agent absolutely ana totally deny) to claim on the steamship Collegian for the cost of removing it from there."

There is no denial here of the specific and reiterated statement that the ship's agent on Saturday, and before the ship's arrival, informe.l plaintiffs that the ship would not be ready to go up to their wharf until Tuesday.

It can scarcely be conceived that plaintiffs could have written the defendant's agent so fully and specifically of the events as they transpired, if they were not warranted by the facts, and that, if the occurrences were not truthfully and correctly stated, the defendant's agent would not have been prompt to deny them. There are a number of other and uncontradicted incidents recited in the evidence which go to strengthen and corroborate the facts as stated by the plaintiffs in their letters from which we have quoted, but which it is unnecessary to recite.

We are firmly persuaded that our esteemed brother of the lower Court properly appreciated the evidence and correctly determined the case in favor of the plaintiffs.

The judgment appealed from is therefore affirmed.

January 23rd, 1905.

Writ denied by Supreme Court, March 27, 1905.